■ In the Matter of NEW YORK CITY HOUSING AUTHORITY TENANT SELECTION DIVISION, Petitioner, v STATE HUMAN RIGHTS APPEAL BOARD et al., Respondents.—Proceeding pursuant to section 298 of the Executive Law to review an order of the State Human Rights Appeal Board, dated March 23, 1977, which affirmed an order of the State Division of Human Rights, dated January 28, 1976, which *inter alia,* found that the petitioner had discriminated against the complainant, Constance Orlando, an applicant for public housing, because she is a mentally disabled person. The State division has cross-applied for enforcement of the order. Petition granted; order annulled and cross application denied, on the law, without costs or disbursements, and the complaint charging an unlawful discriminatory practice is dismissed. We find insufficient evidence in the record to support a finding that the petitioner, the Tenant Selection Division of the New York City Housing Authority (housing authority) discriminated against the applicant Constance Orlando by denying her eligibility for public housing accommodations because she suffered from a mental disability. Section 296 (subd 2-a, par [a]) of the Executive Law, as amended in 1974, prohibits the petitioner, as the managing agent of a publicly assisted housing accommodation, from denying public housing accommodations to an applicant because such person suffers a disability. The term "disability", as defined by subdivision 21 of section 292 of the Executive Law, includes a *mental impairment·* resulting from anatomical, physiological or neurological conditions. Thus, a determination of ineligibility grounded solely upon mental disability would constitute an unlawful discriminatory practice. However, we do not construe such legislation to mean that under no circumstances may a mentally disabled person be denied eligibility. Section 296 (subd 2-a, par [a]) cannot be used to insulate such an applicant from disqualification based on a valid reason. Section 1627-7.2 of the rules and regulations of the State Division of Housing and Community Renewal (9 NYCRR 1627-7.2) states that an applicant must be regarded as a *desirable tenant* to achieve eligibility for admission in any housing authority project. According to the standard of desirability employed, a prospective occupant must be someone who will not or does not constitute: "(a) a detriment to the health, safety or morals of [his/her] neighbors or the community, (b) an adverse influence upon sound family and community life, (c) a source of danger to the peaceful occupation of the other tenants, (d) a source of danger or cause of damage to the premises or property of the authority, or (e) a nuisance." Furthermore, in making such determination, consideration shall be given to, *inter alia:* "medical and other past history, reputation, conduct and behavior * * * and any other data or information * * * that has a bearing upon [his/her] desirability * * *. Any applicant or tenant determined to be ineligible by virtue of the standard herein set forth shall be declared to be ineligible on

the ground of non-desirability." The housing authority, in its rule-making capacity, has promulgated more explicit standards for admission which dovetail with the above regulation. Persons determined to be within the following category, *inter alia,* may be declared ineligible for admission to public accommodations (Standards For Admission, par F): *"Record of Serious Disturbance of Neighbors, Destruction of Property or Other Disruptive or Dangerous Behavior*—Consists of patterns of behavior which endanger the life, safety or welfare of other persons by physical violence, gross negligence or irresponsibility; which damage the equipment or premises in which the applicant resides; or which are seriously disturbing to neighbors or disrupt sound family and community life, indicating the applicant's inability to adapt to living in a multi-family setting." Between 1971 and 1974 Constance Orlando filed several applications with the petitioner for placement in public housing in Richmond County. The applicant was considered for admittance to Cassidy Place, a 380-unit Federally assisted project situated on Staten Island, which was designed to house elderly and disabled tenants. It is undisputed that Constance Orlando is a person suffering from a mental disability. Although the exact nature of her disability was not disclosed during the initial processing of her application, it is clearly established that the housing authority had knowledge that her disability was based upon a mental illness prior to its determination that the applicant was ineligible for public housing. A study of the record, even in a light most favorable to the complainant, requires us to conclude that Ms. Orlando's ineligibility was not predicated upon her mental disability. The record is replete with incidents which portend that the applicant possessed a strong propensity for becoming a disruptive and disorderly tenant. We well appreciate the frustration experienced by one seeking to secure decent housing. Nevertheless, the unsettling effects generated by such an endeavor do not justify the undesirable conduct displayed by Ms. Orlando toward the employees of the housing authority throughout the processing of her application. Her association with various housing authority assistants has been repeatedly marred by claims that she used abusive language, levied slanderous accusations and directed insults toward them. She routinely harassed agency workers with daily telephone calls during office hours. On one occasion she contacted a housing authority assistant at his residence. The content of her message, as relayed to the assistant's minor daughter, was the cause of grave distress and upset the child. Ms. Orlando was more than aggravating and annoying. She was emotionally distressing and disconcerting. She had threatened physical violence against herself, i.e., contemplation of suicide, and, at least on one occasion, against a housing authority assistant, i.e., threatened to shoot him between the eyes. Although such threats were never effectuated or acted upon, we recognize such unbridled outbursts as an indication of a potentially dangerous person who should not be foisted, as a matter of right, upon prospective neighbors comprised largely of elderly and disabled persons. Without exception, all employees who testified at the hearing profiled the applicant in most unfavorable terms. She was described as "nasty", "belligerent", "testy", "combative", "aggressive" and "rude". The reviewing assistants at the main office and the supervisory officer at the Staten Island Applications Office recommended that Ms. Orlando be denied admission to the Cassidy Place project. They regarded her as potentially disruptive of the peace and tranquility of the elderly and disabled neighbors. A similar recommendation was proffered by a medical social worker of the housing authority, who characterized the applicant as a person who demonstrated a chronic pattern

of seriously disruptive behavior. Ms. Orlando manifested a similar disagreeable attitude toward other persons with whom she had dealings. The clergy at Our Lady of Good Counsel Church was compelled to obtain a summons against Ms. Orlando because she had been harassing the church with daily telephone calls. In the opinion of one of the priests, based upon 25 years of experience as a parish priest, Ms. Orlando would create disturbances as a neighbor and tenant. The complainant was inclined to be destructive toward property. The record makes reference to an incident in which the applicant blocked all the drains and plumbing in a former apartment, causing a flood in the office below. On another occasion Ms. Orlando destroyed furniture provided by the Good Counsel priests, who had assisted her in securing a change of residence. The foregoing evidence provides ample indicia that the housing authority did not act arbitrarily or discriminately in denying eligibility to Ms. Orlando. While we sympathize with Ms. Orlando's plight, we find that there is a factual basis for the housing authority's determination that Ms. Orlando would serve as a potential threat to the sound family and community life of prospective neighbors and that she could well be a menace to the elderly and disabled tenants with whom she would reside. Consequently, we find nothing in the record which would establish that the housing authority has practiced a pattern of discrimination against a mentally disabled person. Indeed, the evidence is quite the contrary. Even prior to the effective date of the amendment to section 296 of the Executive Law, the housing authority had a policy of accepting mentally impaired applicants as tenants, provided that they met the other requirements imposed by the pertinent statute and regulations. We note that Ms. Orlando's file had been re-evaluated after the statutory amendment. The housing authority adhered to its original decision. Finding no justification for the State Human Rights Appeal Board's finding of discrimination, we hereby annul its order. Damiani, J. P., Shapiro, Mollen and O'Connor, JJ., concur.